IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

TONYA ILFREY,                          §
                                       §
          Plaintiff,                   §
                                       §
v.                                     §     CIVIL ACTION NO. H-13-406
                                       §
CAROLYN W. COLVIN,[1]                  §
ACTING COMMISSIONER OF THE             §
SOCIAL SECURITY ADMINISTRATION,        §
                                       §
          Defendant.                   §

<u>**MEMORANDUM AND RECOMMENDATION**</u>

Pending before the court[2] are Plaintiff's Motion for Summary Judgment (Doc. 6) and Defendant's Cross-Motion for Summary Judgment (Doc. 7). The court has considered the motions, the responses, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **GRANTED** and Defendant's motion be **DENIED** and that the case be remanded to the Social Security Administration for further proceedings.

## I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by

---

[1]     Michael Astrue was the Commissioner of the Social Security Administration at the time that Plaintiff filed this case but no longer holds that position. Carolyn W. Colvin is Acting Commissioner of the Social Security Administration and, as such, is automatically substituted as Defendant. <u>See</u> Fed. R. Civ. P. 25(d).

[2]     This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. Doc. 4.

the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claim for supplemental security income under Title XVI of the Social Security Act ("the Act").

Plaintiff was born on December 29, 1964, and was forty-two years old on the date of the alleged onset of disability.[3] Plaintiff completed the eleventh grade and earned a General Equivalency Diploma (GED).[4] Plaintiff's right leg was amputated below the knee in 1991, and she was fitted with a prosthetic leg in 1993.[5] Plaintiff first applied for disability benefits in June 1993; the application was denied.[6]

Plaintiff was incarcerated from 1993 to 2003.[7] When she was released from prison in 2003, Plaintiff was again fitted with a prosthetic leg.[8] For a brief period after her release, Plaintiff received disability benefits because of her amputation.[9] Plaintiff received a new prosthetic leg in 2006.[10]

Plaintiff has a history of drug addiction, including a relapse

---

[3]  See Tr. 34, 77, 276, 280, 367.

[4]  See Tr. 34, 77.

[5]  See Tr. 34, 78, 480.

[6]  See Tr. 280.

[7]  See Tr. 34, 372.

[8]  See Tr. 34-35, 372.

[9]  See Tr. 35-36, 55, 485.

[10]  See Tr. 372.

after her incarceration.[11]  That relapse led to the termination of her disability benefits, the revocation of her parole, and her placement in the Texas Department of Criminal Justice Substance Abuse Felony Punishment drug treatment program for eighteen months in 2006-2007.[12]

A.  **Most Recent Application to Social Security Administration**

On November 26, 2007, Plaintiff filed another application for supplemental security income, claiming an inability to work as of October 22, 2007,[13] due to right leg amputation, hypothyroidism, depression, back pain, and hepatitis C.[14]  Between her release from prison in 2003 and the filing of her application in 2007, Plaintiff briefly held jobs in home healthcare, housecleaning, and fast food service.[15]

Plaintiff submitted medical records of treatment during, between, and after periods of incarceration.  The records reflect that Plaintiff did not receive consistent care for her impairments. For purposes of reviewing her disability status, the court focuses on the reports of agency examiners and consultants during the

---

[11]    See Tr. 35-38, 55-57.

[12]    See Tr. 35-36, 55, 57-58, 485.

[13]    In the information reported for Plaintiff's application, May 5, 1990, was recorded as the disability onset date, but elsewhere in the administrative record, the onset date was identified as October 22, 2007.  Compare Tr. 276 with Tr. 367.  In her motion, Plaintiff states that her onset date was October 22, 2007.  Doc. 6, Pl.'s Mot. for Summ. J. p. 2.

[14]    See Tr. 134, 276, 280, 367.

[15]    See Tr. 34-36.

relevant period.

In December 2007, Nalini M. Dave, M.D., ("Dr. Dave") evaluated Plaintiff for disability purposes.[16]  At the time, Plaintiff complained "of problems with the prosthesis with the amputation site as well as back pain and difficulty in ambulating."[17]

At the amputation site, Dr. Dave observed "a moderate amount of granulation tissue suggestive of various cellulitis and infection" and tenderness to the touch.[18]  Plaintiff had "an ill-fitting prosthesis," experienced chronic pain at the amputation site, exhibited difficulty walking, was using crutches, was unable to heel, toe, or tandem walk, and was unable to squat.[19]  An x-ray of Plaintiff's right leg revealed diffuse osteopenia, but no aggressive osseous destruction.[20]

The following day, Plaintiff saw Bradley D. Powell, Ph.D., ("Dr. Powell") for a clinical interview with mental status examination.[21] The mental status examination revealed no problems.[22] Dr. Powell noted that Plaintiff's affect was "neither increased nor decreased in range or intensity," that she was oriented to person,

---

[16]    See Tr. 480-82.

[17]    Tr. 480.

[18]    Tr. 481.

[19]    Id.

[20]    See id.

[21]    See Tr. 485-87.

[22]    See Tr. 486-87.

place, and time, that her gross memory was intact, that her
intellectual functioning appeared to be average, that her thinking
was coherent, logical, and goal directed, that she was not
suicidal, homicidal, or delusional, and that her judgment and
insight were fair.[23]

Dr. Powell determined that Plaintiff was able to maintain her
hygiene and manage her basic responsibilities but was not able to
maintain long-term employment or "demonstrate reasonable levels of
responsibility" due to her years of incarceration.[24] Dr. Powell
diagnosed Plaintiff with cocaine dependence and an unspecified mood
disorder with antisocial traits and determined her Global
Assessment of Functioning ("GAF") to be 55 out of 100, reflecting
moderate symptoms.[25] He opined, based on Plaintiff's history of
drug abuse, that her prognosis was guarded.[26]

In January 2008, Robert Gilliland, M.D., ("Dr. Gilliland")
completed a psychiatric review technique assessment and a mental
residual functional capacity ("RFC") assessment, and Patty Rowley,
M.D., ("Dr. Rowley") completed a physical RFC assessment.[27]

Based on Plaintiff's medical record, Dr. Gilliland assessed

---

[23]     Id.

[24]     Tr. 486.

[25]     See Tr. 487.

[26]     Tr. 487.   In the body of his report, Dr. Powell described her
prognosis as "poor."   See Tr. 486.

[27]     See Tr. 489-514.

whether Plaintiff's psychiatric disposition met or equaled any of the disorders described in the listings of the regulations[28] (the "Listings").[29]   In particular, he considered Listing 12.04 (affective disorders), 12.08 (personality disorders), and 12.09 (substance addiction disorders).[30] Regarding Plaintiff's functional limitations, Dr. Gilliland found that she experienced mild restriction in activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, with no episodes of decompensation of extended duration.[31]   He concluded that her limitations were not severe enough to meet any Listing, stating the alleged severity of mental limitations was not supported by the medical record.[32]

In his Mental RFC Assessment, Dr. Gilliland evaluated Plaintiff as moderately limited in the following categories:  (1) "the ability to understand and remember detailed instructions;" (2) "the ability to carry out detailed instructions;" (3) "the ability to maintain attention and concentration for extended periods;" (4) "the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at

---

[28]    20 C.F.R. Pt. 404, Subpt. P, App. 1.

[29]    See Tr. 489-502.

[30]    See Tr. 489.

[31]    Tr. 499.

[32]    Tr. 501.

6

a consistent pace without an unreasonable number and length of rest periods;" (5) "the ability to interact appropriately with the general public;" (6) "the ability to accept instructions and respond appropriately to criticism from supervisors;" (7) "the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes;" and (8) "the ability to respond appropriately to changes in the work setting."[33]

Regarding all other abilities under the broad categories of understanding and memory, sustained concentration and persistence, social interaction, and adaptation, Dr. Gilliland rated Plaintiff as not significantly limited.[34] He concluded, "The claimant is able to understand and remember detailed but not complex instructions, interact appropriately w[ith] coworkers and supervisors and adapt to change in a typical work setting."[35]

With regard to physical abilities, Dr. Rowley found that Plaintiff was capable of lifting or carrying twenty pounds, frequently lifting or carrying ten pounds, standing and/or walking at least two hours but limited to no more than four hours in an eight-hour workday, sitting for a total of about six hours in an eight-hour workday, and unlimited pushing and/or pulling.[36]

---

[33]   Tr. 503-04.

[34]   See id.

[35]   Tr. 505.

[36]   See Tr. 508.

7

According to Dr. Rowley, Plaintiff was capable of frequently climbing ramp/stairs, stooping, kneeling, and crouching and occasionally climbing ladder/rope/scaffolds, balancing, and crawling.[37] Dr. Rowley found that the record did not establish any manipulative, visual, communicative, or environmental limitations.[38] Finding Plaintiff's alleged limitations "not wholly supported by the evidence in [the] file," Dr. Rowley stated, "Ability to sustain work is somewhat limited by these symptoms, but impact of these symptoms do[es] not wholly compromise the [Plaintiff's] ability to independently initiate, sustain, or complete activities."[39]

Defendant denied Plaintiff's application at the initial and reconsideration levels.[40] Plaintiff requested a hearing before an administrative law judge ("ALJ").[41] The ALJ granted Plaintiff's request, conducted a hearing on November 5, 2008, and issued an unfavorable ruling on February 4, 2009.[42]

The ALJ found that Plaintiff had not engaged in substantial gainful activity since her application date and that she had "the following severe impairments: below right knee amputation with

---

[37] See Tr. 509.

[38] See Tr. 510-11.

[39] Tr. 512, 514.

[40] See Tr. 108, 109, 126-30, 134-37.

[41] See Tr. 143-44.

[42] See Tr. 30-67, 110-21, 187-90.

8

recent stump problems secondary to a poorly fitting prosthesis due to weight loss, chronic back pain, depression, and history of polysubstance abuse in recent remission."[43]   Hepatitis C, hypothyroidism, and uterine fibroids were not considered severe by the ALJ.[44]

Finding that Plaintiff's impairments, singly or in combination, were not of a severity sufficient to meet or equal one of the Listings, that Plaintiff was able to perform the exertional demands of a full range of sedentary work with the limitation of performing only simple, repetitive tasks, and that Plaintiff had no past relevant work, the ALJ found that Plaintiff had the RFC to perform work that existed in significant numbers in the national economy.[45]   The ALJ therefore concluded that Plaintiff was not disabled under the Act at any point since November 26, 2007.[46]

On March 26, 2009, Plaintiff requested that the Appeals Council review the hearing decision.[47]   On March 9, 2010, before the Appeals Council resolved her appeal, Plaintiff filed another application for supplemental security benefits.[48]

---

[43]   Tr. 115.

[44]   See Tr. 116, 118.

[45]   See Tr. 116, 117, 119.

[46]   See Tr. 120-21.

[47]   See Tr. 12, 208.

[48]   See Tr. 12, 124.

On December 30, 2010, the Appeals Council granted Plaintiff's request for review, vacated the ALJ's decision, and remanded it to an ALJ for resolution of several issues.[49] Citing the December 2007 consultative examination, the Appeals Council noted that Plaintiff's stump "revealed a moderate amount of granulation tissue suggestive of cellulitis and infection" and that Plaintiff exhibited difficulty walking due to an ill-fitting prosthesis.[50] The Appeals Council found insufficient evidence to determine whether problems with Plaintiff's stump had improved.[51]

The Appeals Council faulted the ALJ's decision on Plaintiff's RFC for lacking "sufficient rationale with specific references to evidence of record in support of the assessed limitations" and for lacking any limitation related to her ability to function socially even though the ALJ found that she had moderate limitations in that area.[52]

The Appeals Council issued four mandates: (1) obtain additional evidence on the problems Plaintiff was experiencing with her stump secondary to the ill-fitting prosthesis, including seeking a consultative orthopedic examination and medical source statements, as appropriate; (2) give further consideration to

---

[49]   See Tr. 123-25.

[50]   Tr. 123.

[51]   Id.

[52]   Id.

Plaintiff's RFC and provide specific references to supporting record evidence; (3) obtain evidence from a medical expert to clarify the nature and severity of Plaintiff's musculoskeletal impairment; and (4) obtain supplemental evidence from a vocational expert regarding the effect of Plaintiff's limitations on the occupational base.[53]

## B.   2011 Consultative Examinations

In response to the Appeals Council's remand, the ALJ requested that Plaintiff be examined regarding the condition of her right leg post amputation and hypothyroidism and that she undergo a psychological evaluation.[54]   Farzana Sahi, M.D., ("Dr. Sahi") performed the internal medicine examination and Daniel J. Fox, Ph.D., ("Dr. Fox") performed the mental health examination.[55]

Dr. Sahi saw Plaintiff on June 7, 2011.[56]   Plaintiff reported being in a lot of pain at the prosthetic site and having difficulty walking.[57]   The prosthesis, she stated, had been replaced in 2008 but did not fit properly.[58]   Plaintiff's amputation site was clear, according to Dr. Sahi, but Plaintiff had a few ulcers on her

---

[53]   Tr. 124.

[54]   See Tr. 426, 429.

[55]   See Tr. 426, 429, 615-44.

[56]   See Tr. 615-618.

[57]   See Tr. 615.

[58]   See id.

11

thigh.[59]

Dr. Sahi observed that Plaintiff was unable to squat and rise from a squatting position or to bend and touch her fingertips within three inches of the floor without difficulty.[60]  Plaintiff was not able to walk on heels and toes and walked with a limp favoring her right side, Dr. Sahi noted.[61]  Dr. Sahi measured the range of motion in Plaintiff's knee and lumbar spine and the grip strength in her hands.[62]  Dr. Sahi concluded, "Based on current evidence, I find this patient has severe . . . physical and psychological restrictions."[63]

In a Medical Source Statement of Ability to do Work-Related Activities (Physical) of the same date, Dr. Sahi opined that Plaintiff frequently could lift up to ten pounds, occasionally could lift twenty-one to fifty pounds, and occasionally could carry twenty-one to fifty pounds but added the restriction "only sitting."[64]  With regard to sitting/standing/walking, Dr. Sahi wrote, "Most of the time sit [and] lie down."[65]  Dr. Sahi replaced

---

[59]   See Tr. 617.

[60]   See Tr. 617.

[61]   See id.

[62]   See Tr. 626-27.

[63]   Tr. 617.

[64]   See Tr. 619.  Defendant stated in her reply that Dr. Sahi indicated that Plaintiff is capable of lifting/carrying only when sitting, which, with respect to carrying, Defendant found "nonsensical."  See Doc. 9, Def.'s Reply.

[65]   Tr. 620.

the word "cane" with "crutches" in another question, indicating
that Plaintiff required crutches to ambulate.[66]  For the next three
followup questions, Dr. Sahi indicated that the use of a cane (or,
possibly, crutches)[67] was necessary; without which, Plaintiff could
not walk more than ten feet, and, with which, she could not carry
even small objects.[68]

Dr. Sahi found that Plaintiff could occasionally reach
overhead, reach in other directions, handle, finger, feel, and
push/pull with either hand.[69] Dr. Sahi further found that Plaintiff
was not able to operate foot controls with either foot, to climb
stairs and ramps, to climb ladders or scaffolds, to balance, to
stoop, to kneel, and to crouch.[70]  However, Plaintiff was able to
occasionally crawl, Dr. Sahi opined.[71]  Dr. Sahi found no visual,
auditory, or environmental limitations.[72]

Although Dr. Sahi found Plaintiff incapable of shopping,
traveling without a companion, walking a block at a reasonable
pace, using public transportation, walking more than ten feet

---

[66]     See id.

[67]     Dr. Sahi replaced the word "cane" with "crutches" only in the primary
question of that section, not in each of the follow-up questions.

[68]     See id.

[69]     See Tr. 621.

[70]     See Tr. 621-22.

[71]     See Tr. 622.

[72]     See Tr. 622-23.

without the use of an assistive device, or sorting, handling, or using paper/files, the doctor found Plaintiff able to prepare simple meals and feed herself, care for her personal hygiene with assistance for showering, and, with difficulty, climb a few steps at a reasonable pace with the use of a handrail.[73] Dr. Sahi opined that the limitations were first present in 2007.[74]

Plaintiff was examined by Dr. Fox on June 25, 2011.[75] Plaintiff reported that she had been diagnosed with bipolar disorder and was taking medication and that she has difficulty with comprehension, memory, concentration, and focus.[76] Dr. Fox administered a full battery of tests and found that he did not have to repeat instructions to Plaintiff, that Plaintiff understood the instructions, and that Plaintiff remained focused.[77] He found her speech to be rapid and pressured and her affect euthymic, "although she was easily stressed and often became anxious."[78] She completed all portions of the assessment, even though she was slow and struggled with timed tasks.[79]

On the Wechsler Adult Intelligence Scale-Fourth Edition,

---

[73]   See Tr. 624.

[74]   See Tr. 624.

[75]   See Tr. 630-39.

[76]   See Tr. 630.

[77]   See id.

[78]   Tr. 630.

[79]   See Tr. 632.

14

Plaintiff obtained a full scale intelligence quotient of 77, which is in the borderline range (sixth percentile) compared to others her age in the general population.[80]  On the Wide Range Achievement Test 4, Plaintiff's performance level of education attainment was lower than her education history, according to Dr. Fox.[81]  Plaintiff's scores on the Trail Making Test suggested to Dr. Fox that Plaintiff's visuospatial organizational skills were equal to her peers and that she had "no difficulty maintaining instructions or any confusion with tasks that require holding information in working memory."[82]

The results of the Wechsler Memory Scale-Fourth Edition led Dr. Fox to the conclusion that there was "no significant difference between [Plaintiff's] levels of visual memory and visual working memory functioning" and that Plaintiff ranked in the low-average range in her ability to recall verbal and visual information immediately and after a twenty to thirty minute delay.[83]  Dr. Fox stated that Plaintiff's profile on the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") was invalid due to her tendency to respond inconsistently while choosing "true" for most answers.[84]

---

[80]    See Tr. 634.

[81]    See Tr. 635.

[82]    Tr. 635-36.

[83]    Tr. 637.

[84]    Tr. 638.

Therefore, the results, he said, were not indicative of Plaintiff's current mental-health status and were not "facilitative in identifying diagnoses and future treatment behavior."[85]

Dr. Fox concluded: "Results across all assessments suggest gross difficulties in comprehension, perceptual organization, intellectual functioning, and short and long-term memory. This is consistent with [Plaintiff's] report of her current functioning. [Plaintiff] also appears to be experiencing dysphoric mood including extreme anxiety and a low frustration tolerance."[86]   He diagnosed Plaintiff with bipolar I disorder, cocaine dependence, borderline intellectual functioning, and an unspecified personality disorder.[87]   Her prognosis, in Dr. Fox's opinion, was fair "for improved cognitive, social and vocational functioning," if she sought therapy and settled into a stable home environment.[88]

Dr. Fox did not believe that Plaintiff was able to manage benefit payments or understand the meaning of filing for benefits.[89]   In a Medical Source Statement of Ability to do Work-Related Activities (Mental), Dr. Fox gauged Plaintiff's restrictions in understanding and remembering simple instructions, carrying out

---

[85]     Id.

[86]     Id.

[87]     See id.

[88]     Id.

[89]     See Tr. 640.

simple instructions, and making judgments on simple work-related decisions to be mild and her restrictions in understanding and remembering complex instructions, carrying out complex instructions, and making judgments on complex work-related decisions to be moderate.[90]  He found her moderately restricted in her ability to interact appropriately with the public, supervisors, and coworkers, and markedly restricted in her ability to respond to usual work situations and to changes in a routine work setting.[91]

He commented that Plaintiff "showed deficits in all areas of her memory [that were] assessed and difficulty with verbal comprehension," but her processing speed was within the average range.[92]  Dr. Fox further noted that she had a "poor history of coping well under stress," which was exacerbated by her bipolar and personality disorders.[93]  He estimated that Plaintiff's limitations first became present at approximately age twenty.[94]

In July 2011, Plaintiff presented at St. Luke's The Woodlands Hospital's emergency room "with pain, swelling, and redness of her right below-knee amputation stump," which had lasted for four

---

[90]     See Tr. 641.

[91]     See Tr. 642.

[92]     Tr. 641.

[93]     Tr. 642.

[94]     See id.

17

days.[95]  She was admitted to the hospital and given a course of antibiotics, to which she responded well.[96]

## C.  <u>Second Hearing</u>

Pursuant to the Appeals Council remand, the ALJ held another hearing on September 1, 2011.[97]  Plaintiff, a vocational expert, and Lisa Salmons ("Salmons"), Plaintiff's roommate, testified at the hearing.[98]  Plaintiff provided the ALJ with copies of the medical records from two treatment dates that had been missing from the administrative record.[99]  The ALJ also noted that Plaintiff had been seen by the two consulting examiners, Drs. Sahi and Fox.[100] Regarding the reports from those examinations, the ALJ stated, "I find those very informative, very helpful in my understanding of the case."[101]

The vocational expert was the first witness.[102]  The ALJ first asked about Plaintiff's past relevant work, to which the vocational expert answered that Plaintiff had none.[103]  The ALJ posed the

---

[95]    Tr. 656.

[96]    <u>See</u> <u>id.</u>

[97]    <u>See</u> Tr. 12, 68-107.

[98]    <u>See</u> Tr. 68-107.

[99]    <u>See</u> Tr. 70-72.

[100]   <u>See</u> Tr. 72.

[101]   Tr. 72-73.

[102]   <u>See</u> Tr. 76.

[103]   <u>See</u> <u>id.</u>

"hardest hypothetical" she believed to be applicable to Plaintiff, asking whether a younger individual with a GED and no past relevant work who was capable of a full exertional range of sedentary work with the nonexertional limitations of: (1) "[o]nly simple, routine tasks that require little change in the daily routine or setting;" (2) "[s]imple one, two, three repetitive tasks;" and (3) "[o]nly occasional interaction or contact with the general public, coworkers and supervisors could work."[104]   The vocational expert answered that there would be jobs in significant numbers locally or nationally for that individual.[105]

    With that information, the ALJ accepted testimony from Plaintiff, who explained her physical condition:

> My physical problems right now come from my MHMR [mental health and mental retardation].  I'm going through a lot of things with trying to get adjusted on my medication for my bipolar and ADHD [attention deficit hyperactivity disorder] and depression.  I got run over while I was walking down the street by a drunk driver and I had to get my leg cut off and that almost killed me.  And I didn't understand why that I had to be a victim of that, you know.  And now I can't even get -- my life sucks.  I can't even get nobody to help me.  I can't get nothing -- I mean I can't work.  I can't work.  I can't even stand on my -- I can't even keep my leg on an hour.  You know, I crawl around my house, crawl around because this leg that I have on right now, you see it, it's . . . .[106]

Plaintiff stated that she did not receive regular care from a doctor because she did not have insurance and, instead, went to the

---

[104]    Tr. 76-77.

[105]    See id.

[106]    Tr. 78.

emergency room about once a month for treatment of sores or tissue breakdown on her stump.[107]

Plaintiff reported that she had experienced a bout of cellulitis, which caused her stump to swell to the point that it would not fit in her prosthesis.[108]  Plaintiff was unable to wear her prosthesis for approximately two weeks.[109]  Other skin conditions affected her stump and caused her to be unable to wear her prosthesis for a week or two at a time.[110]  She explained that she had "lots of break downs like they call them break downs [sic] in my stump and sores" and that she had gotten staph infections.[111]  As a result of these chronic problems, Plaintiff reported that she was unable to wear the prosthesis, on average, twenty days in a month and that she does not wear it at all at home.[112]  She said she crawled or used crutches at home depending on the distance she needed to walk within the home.[113]  Plaintiff said that the problems with her leg were worse than they had been at the time of the first hearing.[114]

---

[107]   See Tr. 82-83.

[108]   See Tr. 79-80.

[109]   See Tr. 83.

[110]   See Tr. 83, 84, 85, 86.

[111]   Tr. 80.

[112]   See 81.

[113]   See id.

[114]   See Tr. 86.

Plaintiff suffered from scoliosis, she said, due to the unequal lengths of her legs.[115] She reported that she experienced dull, throbbing, tingling pain in her back all day every day and was taking medications to ease the pain and muscle spasms.[116] Even so, going up and down the stairs or picking up clothes to put them in the washer aggravated her back pain.[117]

Plaintiff also testified that kidney stones had become a problem.[118] She stated that she had undergone a procedure to remove one, but another one had developed, which she still had at the time of the hearing because she could not afford the recommended treatment.[119] Plaintiff reported experiencing pain in the side of her stomach and recurring urinary tract infections and being treated for hypothyroidism.[120] Finally, Plaintiff explained that her mental health problems caused her to have bad mood swings.[121]

Salmons, with whom Plaintiff lived at the time, then took the stand and testified that Plaintiff's prosthesis was ill-fitting and, at times, the stump would swell up to triple its size.[122]

---

[115]    See Tr. 87.

[116]    See Tr. 88, 89, 90.

[117]    See Tr. 89.

[118]    See Tr. 90.

[119]    See Tr. 90, 91.

[120]    See Tr. 92, 93.

[121]    See Tr. 93.

[122]    See Tr. 96.

According to Salmons, Plaintiff had more days when she could not wear her prosthesis than days when she could.[123]   Salmons also reported that Plaintiff frequently complained of back pain and had to lie down "quite a bit."[124]  Salmons said that Plaintiff kept "her little area clean" and performed some light housework.[125]  As far as mental health, Salmons agreed that Plaintiff experienced mood swings, reporting that Plaintiff could be "real irritable one minute" and "your best friend the next" or go from very talkative to having nothing to say to anybody.[126]

The ALJ called the vocational expert back and, relying on the hypothetical question that was previously presented, asked for examples of jobs that such a person could perform.[127]   The vocational expert named three: sorter, document preparer, and final assembler.[128]  All three were available in the local and national economy.[129]   When the ALJ added to the previous hypothetical question by asking if someone who needed to miss work at least four days per month could maintain the identified jobs, the vocational

---

[123]   <u>See</u> Tr. 102-03.

[124]   <u>See</u> Tr. 97.

[125]   <u>See</u> Tr. 101.

[126]   <u>See</u> Tr. 98, 100.

[127]   <u>See</u> Tr. 103-04.

[128]   <u>See</u> Tr. 104.

[129]   <u>See</u> <u>id.</u>

expert responded in the negative.[130]

For the final hypothetical question, the ALJ asked the vocational expert whether, if Plaintiff and her roommate's testimony was found to be fully credible, Plaintiff would be able to maintain employment.[131]   The vocational expert opined that Plaintiff would not be able to maintain employment because of the number of days she might miss due to problems with her amputation site, the difficulty in staying on task with constant pain, and the possibility of irritability and argumentative behavior.[132] Additionally, the vocational expert said, employers would not allow her to crawl in order to get from one place to another.[133]   However, if Plaintiff were unable to wear her prosthesis but could get around in a wheelchair, the vocational expert said, the job base would not be affected.[134]

**D.**   **Commissioner's Decision**

The ALJ issued a second unfavorable decision, finding Plaintiff not disabled from November 26, 2007, her application date, to September 21, 2011, the date of the decision.[135]   The ALJ

---

[130]   See id.

[131]   See Tr. 105.

[132]   See Tr. 105-06.

[133]   See Tr. 106.

[134]   See Tr. 104-105.

[135]   See Tr. 9-24.

found Plaintiff's March 2010 application to be duplicative, as did the Appeals Council, and therefore consolidated the two claims.[136]

Although Plaintiff worked after applying for disability benefits in November 2007, the work activity did not constitute substantial gainful activity, as determined by the ALJ.[137]  The ALJ found that Plaintiff suffered from "the following severe impairments: right leg amputation below the knee, chronic low back pain, scoliosis of the lumbar spine, obesity, bipolar disorder, and polysubstance abuse in remission."[138]  This differed from the ALJ's findings in her first decision in that the ALJ did not mention stump problems from Plaintiff's prosthesis, the ALJ included bipolar disorder rather than depression, and the ALJ added scoliosis of the lumbar spine and obesity.[139]

Regarding Plaintiff's amputation, back pain, and mental health, the ALJ discussed the December 2007 physical consultative examination by Dr. Dave, the December 2007 mental consultative examination by Dr. Powell, and an October 2008 examination at First Choice Wellness.[140]  The ALJ also discussed medical evidence of hepatitis C, hypothyroidism, a recent kidney stone, and mild

---

[136]   See Tr. 12.

[137]   See Tr. 14.

[138]   Tr. 15.

[139]   Compare Tr. 15 with Tr. 115.

[140]   See Tr. 15.

24

hydronephrosis, none of which the ALJ considered severe.[141]   Even so, the ALJ stated that she considered all of Plaintiff's impairments, severe and nonsevere, in determining Plaintiff's RFC.[142]

Plaintiff's severe impairments, individually or collectively, did not meet or medically equal any Listing, according to the ALJ.[143]   In particular, the ALJ considered several listed musculoskeletal impairments: (1) Listing 1.02 (major dysfunction of a joint); (2) Listing 1.04 (disorders of the spine); and (3) Listing 1.05B (amputation of one or both lower extremities at or above the tarsal region with stump complications resulting in medical inability to use a prosthetic device to ambulate effectively).[144]   With regard to the first two, the ALJ gave brief reasons for her determination that Plaintiff did not meet or medically equal either but did not cite specific record evidence in support or refer to the opinion of any agency medical expert.[145]

The ALJ's analysis of Listing 1.05B was even briefer:

The claimant does not meet Listing 1.05B amputation of one or both lower extremities at or above the tarsal region, with stump complications resulting in medical inability to use a prosthetic device to ambulate

---

[141]    See id.

[142]    See id.

[143]    See Tr. 16.

[144]    See id.

[145]    See id.

effectively, as defined in 1.00B2[b], which has lasted or
is expected last at least twelve months.[146]

She gave no reason for this conclusion, discussed no evidence in connection with this determination, and cited no agency medical expert.[147]

The ALJ also considered the following listed neurological impairments: (1) Listing 12.04 (affective disorders); and (2) Listing 12.09 (substance addiction disorders).[148] The ALJ discussed the Listings for mental health disorders in some detail, citing the opinions of Dr. Powell, Dr. Gilliland, and Dr. Fox,[149] as well as accounts given by Plaintiff of her mental condition.[150] In reaching her decision on the mental impairments, the ALJ stated, she relied on the opinions of the medical consultants who had determined whether Plaintiff met a Listing at the initial and reconsideration levels of review.[151]

The ALJ turned to an assessment of Plaintiff's RFC, recounting Plaintiff and her friends' testimony at the two hearings.[152]   In

---

[146]     Id.

[147]     See id.

[148]     See id.

[149]     The ALJ did not mention the name of the provider who performed the 2011 consultative examination in this section of her decision but did refer to the month and year in which it occurred. See Tr. 16-17. The discussion clearly reflects Dr. Fox's opinions.

[150]     See Tr. 16-18.

[151]     See Tr. 18.

[152]     See Tr. 18-20.

determining Plaintiff's RFC, the ALJ found that Plaintiff's
"medically determinable impairments could reasonably be expected to
cause the alleged symptoms; however, the claimant's statements
concerning the intensity, persistence and limiting effects of these
symptoms are not credible to the extent they are inconsistent with"
the ALJ's assessment of Plaintiff's RFC.[153]   The ALJ gave
Plaintiff's "subjective complaints the greatest consideration
supported by the record."[154]

    The ALJ detailed Plaintiff's medical and mental health
treatment, including the brief mention of the two June 2011
consultative examinations.[155]   The full text of the ALJ's mention of
the 2011 examinations is:

> The claimant attended an internal medicine
> consultative examination on June 7, 2011[,] and reported
> that she had a lot of pain at the prosthetic site and
> noted that she often d[id] without the prosthesis and
> crawl[ed] around at home.   Examination revealed the
> "stump was clear, but a few ulcers were noted on the
> thigh 1.0 cm."   On June 25, 2011, the claimant attended
> a psychological consultative examination and completed a
> full battery of testing.   Her MMPI-2 scores revealed an
> invalid profile.   She was found to have bipolar I
> disorder, cocaine dependence in full remission,
> borderline intellectual functioning, and personality
> disorder, NOS [not otherwise specified] (cluster B
> traits).   On the day of the testing, she was assigned a
> [GAF] score of 55, indicating moderate impairment.   The
> psychologist opined that she was not able to manage

---

[153]   Tr. 21.

[154]   Tr. 22.

[155]   See Tr. 19-22.

payments for herself.[156]

The ALJ recognized that Plaintiff's condition had worsened in 2011 "due to additional medical problems that arose related to her kidneys" and "a number of new medical conditions that caused stump edema and abdominal pain" but found that those conditions had been treated and were not expect to last for twelve months or more.[157]

Although the ALJ found that the medical evidence supported a finding that Plaintiff experienced limitations, the ALJ determined that the objective medical evidence, as well as the treating and examining physicians' opinions, did not support a finding of severity that would prevent her from performing work-related tasks in line with the ALJ's RFC assessment.[158]   The ALJ concluded that Plaintiff was capable of sedentary work with the following limitations: "simple, routine 1, 2, 3 step tasks with little change in daily routine setting and occasional interaction with co-workers, supervisors, and the public."[159]   Although similar to the

---

[156]     Tr. 21-22 (internal citations omitted).  The ALJ also mentioned the psychological consultant in the discussion of the Listings, where the ALJ stated that the examiner noted that Plaintiff's behavior during testing was not consistent with her reports that she had "trouble completing tasks due to concentration and memory deficits." Tr. 17-18. As the ALJ also noted, Plaintiff was slow to complete tasks and struggled with timed tasks.  Tr. 18.

[157]     Tr. 22.  In its reply, Defendant suggests that this finding supports the conclusion that Plaintiff is not disabled by the problems with her amputation site.  Doc. 9, Def.'s Reply p. 5.  The court reads this section to mean that the "additional medical problems" (e.g., kidney problems) had been resolved and were not expected to last for a period of twelve months.

[158]     See Tr. 22.

[159]     Tr. 18.

RFC in the first decision, this one had the added limitations of little change in routine and occasional social interaction.[160]

Because Plaintiff had not worked for long enough periods at any job she had held in the last fifteen years, the ALJ proceeded to the last step of the disability analysis.[161]  Relying on the vocational expert's testimony, the ALJ found that Plaintiff would be able to perform the requirements of a sorter, a document preparer, and a final assembler, all unskilled and sedentary positions.[162]  The ALJ concluded that Plaintiff was not disabled from November 26, 2007, to the date of the ALJ's decision.[163]

Plaintiff appealed the ALJ's decision, and, on January 3, 2013, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[164]  Plaintiff then timely sought judicial review of the decision by this court.

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating

---

[160]    Compare Tr. 18 with Tr. 117.

[161]    See Tr. 14, 22.

[162]    See Tr. 23.

[163]    See Tr. 24.

[164]    See Tr. 1-3, 8.

the record; and 2) substantial evidence in the record supports the decision. <u>Waters v. Barnhart</u>, 276 F.3d 716, 718 (5th Cir. 2002).

## A. <u>Legal Standard</u>

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act. <u>Wren v. Sullivan</u>, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); <u>see also</u> <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994). The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); <u>see also</u> <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial
> gainful activity, will not be found to be disabled no
> matter what the medical findings are; (2) a claimant will
> not be found to be disabled unless [s]he has a "severe
> impairment;" (3) a claimant whose impairment meets or is
> equivalent to [a Listing] will be considered disabled
> without the need to consider vocational factors; (4) a
> claimant who is capable of performing work that [s]he has

> done in the past must be found "not disabled;" and (5) if the claimant is unable to perform h[er] previous work as a result of h[er] impairment, then factors such as h[er] age, education, past work experience, and [RFC] must be considered to determine whether [s]he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 416.920. By judicial practice, the claimant bears the burden of proof on the first four of the above steps, while the Commissioner bears it on the fifth. Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999). If the Commissioner satisfies her step-five burden of proof, the burden shifts back to the claimant to prove she cannot perform the work suggested. Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

**B.   Substantial Evidence**

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). It is "something more than a scintilla but less than a preponderance." Id. The Commissioner has the responsibility of deciding any conflict in the evidence. Id. If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm. 42 U.S.C. § 405(g); Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment.  <u>Brown v. Apfel</u>, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  <u>Id.</u>

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Plaintiff asserts that the ALJ's decision contains multiple errors under the broader category of failure to consider all of the evidence.  Specifically, Plaintiff argues that, on remand, the ALJ "ignored the . . . salient disability findings" of Drs. Sahi and Fox, pointing to large sections of their evaluations that were absent from the ALJ's discussion of evidence.[165]  Defendant argues that the decision is legally sound and is supported by substantial evidence.

Despite the implication of the Appeals Council's denial of Plaintiff's request for review of the ALJ's second decision, the ALJ did not comply with all of the mandates of the Appeals

---

[165]    Doc. 6, Pl.'s Mot. for Summ. J. p. 6.

Council's remand; specifically, she failed to obtain evidence from a medical expert to clarify the nature and severity of Plaintiff's musculoskeletal impairments.  The ALJ's failure to do so, in and of itself, however, is not legal error that warrants remand.  See Henderson v. Colvin, 520 F. App'x 268, 273 (5th Cir. 2013)(unpublished).  Remand is warranted when the ALJ fails to apply the proper legal standard or the ALJ's decision is not supported by substantial evidence.  Id.

The court agrees with Plaintiff that the ALJ all but ignored Dr. Sahi's 2011 consultative examination.[166]  The court finds that the ALJ's failure to give that examination sufficient attention gave rise to at least two errors, either of which warrants remand for further consideration: (1) the ALJ erred in giving little weight to the consultative examiner's opinions without explanation; and (2) substantial evidence does not support the ALJ's decision that Plaintiff's condition did not meet Listing 1.05B.

**A.  Dr. Sahi's Opinions**

The regulations require that every medical opinion received be evaluated.  See 20 C.F.R. § 404.1527(b).  Several factors are considered in deciding the weight to give each medical opinion.  20 C.F.R. § 404.1527(c).  The following types of medical sources are entitled to more weight than others: (1) examining sources; (2)

---

[166]   The ALJ gave more, albeit not much more, attention to Dr. Fox's opinions.  However, the court finds no error results from the ALJ's treatment of Dr. Fox's opinion.

treating sources; (3) sources that present medical signs, laboratory findings, other relevant evidence, and explanations to support their opinions; (4) sources that provide opinions consistent with the record as a whole; (5) sources with a relevant specialization; and (6) sources that have an understanding of the disability system and its evidentiary requirements or are familiar with other information in the particular claimant's case.  Id. Medical source opinions must be carefully considered, even on issues reserved to the Commissioner.  Soc. Sec. Ruling 96-5p, 1996 WL 374183, at *2.

Here, the ALJ gave a prior nonexamining source's opinions more weight than those of Dr. Sahi, who examined Plaintiff.  Dr. Sahi examined Plaintiff in 2011 and provided medical observations and explanations supporting her opinions.  Dr. Sahi's findings were consistent with Dr. Dave's December 2007 findings and the testimony at both hearings.  Moreover, Dr. Sahi was a consultant hired by the Commissioner, which suggests that she had experience examining disability claimants and had an understanding of the disability system.

Yet, in a decision that was four pages longer than the first decision, the ALJ referred very little to the opinions of Dr. Sahi. In fact, only one sentence of the ALJ's thirteen-page opinion referred to Dr. Sahi's opinions.[167]  What little other mention the

---

[167]    See Tr. 21.

ALJ made of Dr. Sahi's report simply repeated information that Plaintiff had reported to the doctor.[168]

Of particular concern, the ALJ did not mention Dr. Sahi's Medical Source Statement of Ability to do Work-Related Activities (Physical) and did not incorporate most of Dr. Sahi's findings regarding Plaintiff's abilities.  Where the ALJ found Plaintiff capable of lifting and/or carrying ten pounds occasionally and less than ten pounds frequently, Dr. Sahi found Plaintiff only capable of lifting/carrying weight while sitting but not carrying any weight at all while ambulating.[169]  Where the ALJ found Plaintiff capable of standing and/or walking for two hours in an eight-hour day and capable of sitting for six hours in an eight-hour day, Dr. Sahi found Plaintiff only capable of standing for five to twenty minutes at a time and walking for five to ten minutes at a time,[170] opining that Plaintiff needed to sit and lie down most of the time and that she could only walk ten feet without a cane (or crutches).[171]

The ALJ imposed no other physical limitations, while, according to Dr. Sahi, Plaintiff was only occasionally able to

---

[168]    See id.

[169]    Compare Tr. 18 with Tr. 619.

[170]    Dr. Sahi did not offer any opinion on the total amount of time Plaintiff was capable of sitting, standing, or walking in an eight-hour day.  See Tr. 620.

[171]    Compare Tr. 18 with Tr. 620

reach, handle, finger, feel, and push/pull, never able to operate foot controls, climb stairs and ramps, climb ladders or scaffolds, balance, stoop, kneel, or crouch, and occasionally able to crawl.[172] Overall, the ALJ's RFC determination is much less restrictive than that found by Dr. Sahi.

The court is not suggesting that the ALJ should have discussed each of the factors for attributing weight to Dr. Sahi's opinions. However, the ALJ's RFC conclusion so clearly disregards the opinions of Dr. Sahi as to indicate that the ALJ did not consider the relevant factors at all in determining the weight given to Dr. Sahi's opinions.  The court finds that the ALJ erred by, without explanation, failing to give Dr. Sahi's opinions significant weight, particularly in light of an absence of medical records from a treating physician.  The ALJ's decision should be remanded for more discussion of Dr. Sahi's opinions and the weight to which they are entitled.

**B.  Listing 1.05B**

Listing 1.05B applies when the claimant has had one or both lower extremities amputated at or above the tarsal region and has "stump complications resulting in medical inability to use a prosthetic device to ambulate effectively . . . which have lasted or are expected to last for at least twelve months."  Ineffective ambulation is defined as "an extreme limitation of the ability to

---

[172]    Compare Tr. 18 with Tr. 621-22.

walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." Listing 100B2b(1).

In further explanation, the regulation section states that it generally means "having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities . . . . To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." Listing 100B2b(1), (2). Examples given are, without limitation, "the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." Listing 100B2b(2).

The ALJ stated that Plaintiff did not meet the Listing, simply repeating the regulatory language without any explanation.[173] The court cannot determine what aspect of the Listing that the ALJ found unfulfilled. The ALJ did not cite to any record evidence to explain why Plaintiff did not meet the Listing. Although not

---

[173]    See Tr. 16.

37

specifically stated with regard to the musculoskeletal Listings, the ALJ presumably relied on the staff medical consultants who reviewed Plaintiff's record at the initial and reconsideration levels of the process in making this determination,[174] despite a more recent report from Dr. Sahi (not to mention the Appeals Council's mandate to seek clarification from a medical expert).[175] This is, of course, permissible when, in the ALJ's view, the additional medical evidence would not change the state consultant's finding that the impairment is not equivalent to a Listing.  See Soc. Sec. Ruling 96-6p, 1996 WL 374180, at *3; Haywood v. Sullivan, 888 F.2d 1463, 1468 (5th Cir. 1989)(citing Soc. Sec. Ruling 83-19, 1983 WL 31248); Brister v. Apfel, 993 F. Supp. 574, 578 n.2 (S.D. Tex. 1998).

Here, the problem with the ALJ's determination that Plaintiff's impairment did not meet or equal Listing 1.05B is that it is not supported by substantial evidence.  Substantial evidence supports the ALJ's finding at step three if the plaintiff fails to demonstrate the specified medical criteria.  Cf. Selders, 914 F.2d at 619 ("The claimant must provide medical findings that support each of the criteria for the equivalent impairment determination.").

Dr. Sahi's report, which is consistent with that of Dr. Dave

---

[174]    The ALJ explicitly relied on these consultants in making her step-three determination regarding Plaintiff's mental impairments.  See Tr. 18.

[175]    Tr. 18.

and the testimony of hearing witnesses, reflects that Plaintiff did experience "stump complications resulting in medical inability to use a prosthetic device to ambulate effectively." Listing 1.05B. Of particular note, Dr. Sahi opined that Plaintiff could not ambulate independently without the use of hand-held assistive devices for more than ten feet and could not carry anything, even small objects. Dr. Sahi also found Plaintiff incapable of walking for more than five to ten minutes or climbing stairs. The doctor also opined that Plaintiff could not climb even a few steps with the use of a hand rail without difficulty. Dr. Sahi's report strengthens other evidence in the record. In 2007, Dr. Dave found evidence of cellulitis and infection at the stump site and noted tenderness. Dr. Dave also recorded that Plaintiff was using crutches and that she had difficulty walking and was unable to heel, toe, or tandem walk, or to squat. Plaintiff and her roommate's testimony at the second hearing added more evidence about Plaintiff's stump complications and her inability to walk using her prosthetic device for very long at all. In July 2011, Plaintiff was admitted to the hospital for pain, swelling, and redness at her stump site.

The court recognizes that the amount of evidence in favor of a finding of disability is irrelevant if substantial evidence supports the ALJ's decision that Plaintiff is not disabled. However, the court finds no evidence in this record, medical or

testimonial, that contradicts the opinions of Drs. Dave and Sahi and the testimony of Plaintiff and her roommate.  Without the ALJ's citation to evidence supporting her conclusion that Plaintiff does not meet Listing 1.05B,[176] the court must conclude that the determination is not supported by substantial evidence.

## IV.  Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion be **GRANTED** and Defendant's motion be **DENIED**.  If this Memorandum and Recommendation is adopted, this case should be remanded to the Social Security Administration for further consideration of Dr. Sahi's opinions and whether Plaintiff's impairment meets or equals Listing 1.05B.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.  Failure to file written objections within the time period

---

[176]    In her decision, the ALJ mentioned a two-year gap in the medical evidence, from which she inferred that Plaintiff experienced no serious problems with infection at her stump site.  See Tr. 21.  Plaintiff explains in her brief that she was unable to afford treatment and was incapable of accessing medical care for the impoverished.  Doc. 8, Pl.'s Resp. p. 3 (citing to Tr. 78, 82, 90).  Quoting Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987), Plaintiff argues that "medicine or treatment an indigent person cannot afford is no more a cure for his condition than if it had never been discovered. . . . To a poor person, a medicine that he cannot afford to buy does not exist."

While not insignificant, the gap in the medical records, in light of Plaintiff's circumstances and the evidence as a whole, does not suggest that Plaintiff was not suffering from stump complications or difficulty ambulating.  During periods of treatment before and after the gap, Plaintiff suffered from stump complications that prohibited effective ambulation.  Thus, the lack of treatment alone is not substantial evidence to support a finding of not disabled.

mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.   Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 28<u>th</u> day of March, 2014.


Nancy K. Johnson
United States Magistrate Judge